{¶ 28} I respectfully dissent. The Unemployment Compensation Review Commission found that Thompson was discharged for just case and thu s was ineligible for unemployment compensation because "*** no employer can tolerate an employee making threats of bodily harm to another. Regardless of any provocation, claimant's threats were gross misconduct." Because the Sandusky Court of Common Pleas created new facts and substituted its own judgment on the reasonableness of the discharge, I find appellants' assignments of error well-taken and would reverse.
 {¶ 29} The Supreme Court of Ohio has held that common pleas courts and appellate courts are to apply the same standard in reviewing unemployment a dministrative decisions. This standard is not de novo review. See Tzangas, Plakas Mannos v. Ohio Bur. of Emp. Serv.
(1995), 73 Ohio St.3d 694, 696-697, 653 N.E.2d 1207. A reviewing court may reverse the administrative determination only if it is unlawful, unreasonable, or against the manifest weight of the evidence. The Review Commission's role as a fact finder remains intact. Id.
 {¶ 30} In two major areas the trial judge departed from facts found by the hearing officer: (1) the reason for Thompson's firing and (2) the company's knowledge of problems between the two co-workers. First, the trial court says that Thompson was discharged for "a statement that was made to his supervisor as to another employee with whom he had ongoing difficulties."
 {¶ 31} Aeroquip's reason for Thompson's discharge is revealed during the cross-examination of its human resources manager.
 {¶ 32} "Q. Well, what exactly is it that the company says was the reason why Mr. Thompson was discharged?
 {¶ 33} "A. Exactly word for word?
 {¶ 34} "Q. Yeah.
 {¶ 35} "A. The letter that we sent him confirming his termination, `We have taken this action as a result of our investigation of certain inc idents involving your behavior. Specifically, our investigation indicated that you threatened a co-worker. This was confirmed by both you and others who witnessed the statement. This constitutes a clear violation of our workplace safety policy which has been presented to you and others in July of 2000.'"
 {¶ 36} The policy referred to was also a part of record and explicitly states:
 {¶ 37} "These rules generally result in immediate discharge:
 {¶ 38} "Engaging in horseplay, running, throwing things, scuffling, fighting or other activity which may provoke violence onCompany premises, etc." (Emphasis added).
 {¶ 39} Aeroquip terminated Thompson for a violation of its company policy rather than for a mere statement. The statement itself was a threat of se rious harm to a co-worker which an ordinarily intelligent person would understand might lead to discharge from employment. Thompson threatened to harm a fellow employee by "stabbing him in the heart." It does not matter whether this threat was contingent or was made to the co-worker directly. This statement made, repeated, and admitted to, is more than the profane or abusive language that an employer can tolerate. See Lombardo v. Ohio Bur. of Emp. Serv. (1997), 119 Ohio App.3d 217. It is more than a matter of frustration.
 {¶ 40} Contrary to the trial court's interpretation, such threats are not "predictable" in the workplace. Thompson had other recourse if he were di ssatisfied with the inaction of his supervisors over his complaints about a co-worker. He could have sued, if as he claimed, he was being harassed at work. To threaten to stab someone in the heart with a screwdriver is gross misconduct, capable of leading to termination. There was adequate evidence in the record to support the review commission's findings.
 {¶ 41} The second departure from the review commission's findings was the common pleas court's conclusion that the supervisor knew of probl ems between the individuals and did not deal with them. To the contrary, the review commission's findings indicate that, while Thompson may have complained several times about his co-worker, no misconduct by that co-worker was ever demonstrated, so there was nothing for the company to act upon. Furthermore, the trial court's conclusion is not supported by the record; Thompson's immediate supervisor did not testify. Thompson himself testified that he never spoke to the plant manager although he tried to "about 15 or 16 times" and that on several occasions he left a note saying he "very much needed to see him over the situation with [a co-worker]."
 {¶ 42} Whether the human resources manager knew of the problems and did not deal with them also was disputed. The manager testified about o ne conversation she had with Thompson:
 {¶ 43} "Q. Okay. Did you ever have any conversations with Mr. Thompson where he complained about behavior or actions taken toward him by this [co-worker]?
 {¶ 44} "A. Yes, I did.
 {¶ 45} "Q. And what did Mr. Thompson tell you about [a co-worker]?
 {¶ 46} "A. He told me that he was, I'm trying to remember the phrase, gosh, a punk, a young punk.
 {¶ 47} "Q. Did he indicate that . . . that [this co-worker] was sexually harassing him?
 {¶ 48} "A. He did not, that I remember, indicate sexual harassment. They had issues in the work environment with, I'd say tools, but one thing that com es to mind is over a rag. There was a little set to between he and [this co-worker] that was handled separately, an investigation.
 {¶ 49} "* * *
 {¶ 50} "Q. As a result of that investigation, was any action taken against either Mr. Thompson or [his co-worker]?
 {¶ 51} "A. Yes. On December 7th, Mr. Thompson received a written notice for inappropriate behavior towards a co-worker using abusive lan guage that's not acceptable."
 {¶ 52} After the human resources manager denied that Thompson complained to her on more than one occasion about [his co-worker], the record shows c ounsel asked:
 {¶ 53} "Q. If Mr. Thompson were to testify that he had repeatedly complained to you that he was being harassed in various ways by [his co-worker ], you would have no reason to believe that his testimony was untrue?
 {¶ 54} "A. If that were the case, we would have investigated, and we may very well have, I know we have because of the rag incident. He must have . . . Someone must have come forward with a complaint for us to investigate the rag incident. So if he complained and let us know that he was being harassed, we would have followed it up with an investigation."
 {¶ 55} In reversing the administrative decision, the trial court reinterpreted the disputed facts in favor of Thompson and concluded: "That [Thompson] would make an inappropriate statement as to his frustration regarding the other employee was predictable under a totality of the circumstances and to deny him unemployment benefits for an action for which management is not without reproach is unreasonable."
 {¶ 56} The trial court's conclusion conflicts with the hearing officer's determination that "Even if claimant had been harassed by [his co-worker] for t wo years, and the evidence does not support thatallegation, that would not excuse his threats. *** [N]o employer can tolerate an employee making threats of bodily harm to another. Regardless of any provocation, claimant's threats were gross misconduct. The employer cannot be exposed to potential liability that would accrue if such threats were ignored." (Emphasis added.)
 {¶ 57} The hearing officer clearly did not give much weight to Thompson's allegations of harassment, and therefore, the trial court's fin ding that Thompson's frustration level reached the point that threatening a co-worker reasonable is contrary to the determination made by the review commission.
 {¶ 58} As the Ohio Supreme Court has stated, factual determinations are the exclusive province of the review commission. SeeHa ll v. American Brake Shoe Co. (1968), 13 Ohio St.2d 11, 14,233 N.E.2d 582. The common pleas court may not weigh the evidence or substitute its judgment for an administrative officer in factual determinations. Simon v. Lake Geauga Printing Co. (1982), 69 Ohio St.2d 41,45, 430 N.E.2d 468.
 {¶ 59} Because the Unemployment Compensation Review Commission's decision was not unlawful, unreasonable, or against the manifest weight of the evidence, I would find appellants' assignments of error to be well-taken and would reverse the judgment of the Sandusky County Court of Common Pleas.